UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

GARY LEE SMITH,

                  Petitioner,

          v.                                     **MEMORANDUM AND ORDER**
                                                  20-CV-2083 (RPK)

WARDEN,

                  Respondent.

-------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

Petitioner Gary Lee Smith is serving a state prison sentence after being convicted of attempted murder, rape, and other crimes in New York state court. The state appellate court affirmed his conviction on direct appeal. Petitioner now seeks a writ of habeas corpus under 28 U.S.C. § 2254, raising several claims. For the reasons explained below, the petition is denied.

## BACKGROUND

### I.    Factual History

The following facts are taken from the state court record, viewed in the light most favorable to the prosecution. *See Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam); *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam).

In June 2015, petitioner, his girlfriend MC, and MC's friend Alvin Horne were seated in a truck parked outside of petitioner's home. Trial Tr. dated 10/25/2016 ("10/25 Tr.") 49:19–50:14 (Dkt. #24-3). After petitioner and MC began arguing, petitioner pulled MC into the backseat by her hair and began choking her neck with his hands. *Id.* at 171:04–172:12. Petitioner then exited

1

the truck, opened the passenger-side door, pulled MC onto the street, and started stomping and hitting her. *Id.* at 172:14–16.

The next month, in July 2015, petitioner and MC met outside an abandoned house. *Id.* at 61:09–62:10. At their meeting, petitioner brandished a knife and told MC he would kill her. *Id.* at 63:12–15. Petitioner then told MC he wanted to have sex with her, and MC "let it happen" because she was afraid he would stab her if she did not comply. *Id.* at 64:07–25. Afterwards, petitioner threw MC down on her stomach and began stabbing her. *Id.* at 66:03–06. Petitioner eventually left, and MC ran to a house nearby where she called for help. *See* Trial Tr. dated 10/24/2016 ("10/24 Tr.") 39:01–11 (Dkt. #24-2). The resident called 911. *Id.* at 39:08–20. Police officers responded to the scene, and MC told them that petitioner had stabbed her. *Id.* at 87:19–21. MC was then taken to the hospital. *Id.* at 139:23–141:05.

Later that night, police officers knocked on the door of petitioner's home and were let in by the house manager. *Id.* at 182:08–13, 184:01–09. The officers then knocked on the door to petitioner's room, asked petitioner to step into the hallway, and handcuffed petitioner. *Id.* at 184:06–185:02. The officers told petitioner that they were going to take him to the police precinct, and petitioner asked the officers if he could get his sneakers. *Id.* at 185:19–25. One of the officers asked petitioner where his sneakers were, and petitioner nodded towards his bedroom and said they were in there. *Id.* at 186:08–11. The officer then went into petitioner's room and grabbed the sneakers. *Id.* at 186:15–19. After grabbing the sneakers, the officer noticed blood on them. *Id.* at 186:22–187:02. Rather than giving the sneakers to petitioner to wear, the officer turned the sneakers over to a detective for processing. *Id.* at 187:19–23. Genetic testing of a bloodstain on one of the sneakers resulted in a match with MC's DNA profile. Trial Tr. dated 10/26/2016 ("10/26 Tr.") 43:12–15 (Dkt. #24-3).

Officers also visited the abandoned house where MC was stabbed.  10/24 Tr. 165:13–18. Officers recovered eyeglasses, a napkin, a bicycle, a pack of cigarettes, a lighter, and a used condom.  10/25 Tr. 19:01–32:09, 187:09–13.  They also observed a bloodstain on the driveway and recovered a portion of it for testing.  *Id.* at 29:07–11.  The eyeglasses, the napkin, and one of the bicycle's handlebars tested positive for the presence of blood matching MC's DNA profile. 10/26 Tr. 49:19–52:05, 74:06–75:11, 81:04–82:13.  The bloodstain sample from the driveway also matched MC's DNA profile.  *Id.* at 79:06–80:17.  Forensic testing on the iced tea can and lighter did not result in any matches.  But petitioner could not be excluded as the source of DNA found on the iced tea can, *id.* at 69:13–16, and MC could not be excluded as the source of DNA found on the lighter, *id.* at 71:25–72:03.  Forensic testing on the condom did not match petitioner's DNA profile.  *Id.* 62:03–05.

## II.   Procedural History

A grand jury charged petitioner with second-degree attempted murder, first-degree assault, second-degree assault, third-degree rape, and second-degree menacing in connection with the July 2015 attack.  Indictment 14–15 (ECF pagination) (Dkt. #24).  The grand jury also charged petitioner with third-degree assault and criminal obstruction of breathing or blood circulation in connection with the June 2015 attack.  *Id.* at 15–16.

### A.   Pretrial Hearing

Prior to trial, the trial court held a hearing regarding the sneakers that police officers recovered from petitioner's room.  Hearing Tr. dated 1/22/2016 ("1/22 Tr.") (Dkt. #24-1).  The trial court initially described the proceeding as a "*Huntley* hearing," *id.* at 2:03, referencing *People v. Huntley*, 204 N.E.2d 179 (N.Y. 1965), a New York case requiring courts to "find voluntariness beyond a reasonable doubt before [a] confession can be submitted to the trial jury," *id.* at 183.  At the hearing, petitioner's counsel argued that petitioner's statement asking the police whether he

3

could retrieve his sneakers was involuntary. 1/22 Tr. 22:08–15. Specifically, petitioner's counsel maintained that because petitioner had not received a *Miranda* warning prior to making the statement, the statement should be excluded. *Ibid.*

The trial court held that the defendant's statement asking to retrieve his sneakers "was not pursuant to any questioning by any of the police" and therefore declined to suppress it. *Id.* at 29:16–23. The trial court also noted that the *Huntley* hearing had "morphed into a probable cause hearing," *id.* at 29:13–14, and declined to suppress the sneakers because petitioner had consented to a police officer retrieving them from his room, *id.* at 29:16–20.

**B.    Trial**

At trial, the prosecution called several witnesses, including MC, 10/25 Tr. 45:09–137:03, 163:09–167:06, Alvin Horne, *id.* at 167:09–179:19, the person who called 911 after MC was stabbed, 10/24 Tr. 36:25–69:02, and the 911 operator who received the call, *id.* at 70:19–81:18. The prosecution also called the officers who went to the scene of the stabbing and collected physical evidence, *id.* at 177:12–196:10, 198:22–207:19; 10/25 Tr. 3:09–5:02, 179:20–221:14, 221:19–237:16, as well as the forensic scientist who analyzed the physical evidence, 10/26 Tr. 19:06–87:21, 94:01–136:03. Finally, the prosecution called a nurse and doctor who treated MC at the hospital. *Id.* at 3:17–19:03, 137:20–171:06.

After the prosecution rested, petitioner's counsel sought to introduce testimony from two mental health professionals who conducted a screening of MC after she was arrested on robbery charges in 2006. *Id.* at 172:04–13. According to petitioner's counsel, the testimony was relevant to MC's credibility and mental state because records from the screening contradicted MC's earlier testimony and showed that she didn't "understand[] any of the proceedings." *Id.* at 173:12–18. Petitioner's counsel also asserted that the records described MC as "manipulative and hypomanic," which counsel argued further undermined her credibility. *Id.* at 174:07–16. The trial court

4

precluded the testimony, holding that "some type of foundation . . . should have been laid" demonstrating how "the issue of [MC's] mental health" was "relevant to the charges against" petitioner. *Id.* at 177:24–178:06.

At the conclusion of trial, the jury convicted petitioner on all charges. Trial Tr. dated 10/28/2016 ("10/28 Tr.") 10:14–12:24 (Dkt. #24-3). With respect to both the second-degree attempted murder charge and the first-degree assault charge, the court sentenced petitioner to twenty-five years imprisonment and twenty-five years of supervised release, to run concurrently with one another. Hearing Tr. dated 12/22/2016 ("12/22 Tr.") 28:09–19 (Dkt. #24-5). With respect to the second-degree assault charge, the court sentenced petitioner to seven years imprisonment and five years of supervised release, also to run concurrently. *Id.* at 28:20–24, 30:13–18. With respect to the third-degree rape charge, the court sentenced petitioner to four years imprisonment and ten years of supervised release, to run consecutively with the sentences for the prior three convictions. *Id.* at 28:24–29:12. Finally, the court sentenced petitioner to one year imprisonment each on the misdemeanor charges of second-degree menacing, third-degree assault, and criminal obstruction of breathing or blood circulation. *Id.* at 29:13–16. The court did not state whether the sentences for the misdemeanor charges were to run consecutively or concurrently to the sentences for the felonies.

### III.    Petitioner's Direct Appeal

Petitioner appealed his conviction and sentence, raising several grounds for relief. *See generally* Pet'r's App. Br. (Dkt. #24).

*First*, petitioner argued that the trial court erred by declining to suppress the bloodstained sneakers based on the testimony at the *Huntley* hearing. *Id.* at 12. According to petitioner, the trial court should have held a separate hearing regarding the admissability of the sneakers pursuant to *Mapp v. Ohio*, 367 U.S. 643 (1961). *Id.* at 13. Petitioner further contended that, had the trial

court held a separate *Mapp* hearing, it would have suppressed the sneakers as illegally seized under the Fourth Amendment. *Id.* at 13–16.

*Second*, petitioner contended the trial evidence was legally insufficient to support his convictions for attempted murder and rape. On petitioner's view, the State had not proven that petitioner intended to kill rather than merely injure MC—a key element of petitioner's murder conviction. *See id.* at 16–20. As for the rape charge, petitioner argued that the evidence—in particular, MC's own testimony—showed that MC had consented to sex with petitioner. *See id.* at 20–25. And more generally, petitioner argued that MC, the sole eyewitness to the crime, was so incredible that the jury was not justified in relying on her. *See id.* at 26–34. In that vein, petitioner argued that MC's lack of credibility justified setting aside the guilty verdict on all charges. *Ibid.*

*Third*, petitioner claimed he was denied his right to present an adequate defense when the trial court denied his request to call two witnesses to impeach MC's credibility. *See id.* at 34–44.

*Fourth*, petitioner made several arguments respecting his sentence. He argued that the trial court misapplied New York Penal Law § 70.25(2) by running his sentences for attempted murder and rape consecutively rather than concurrently, *see id.* at 44–50, that the court had impermissibly punished him for exercising his right to go to trial by imposing the maximum sentence authorized under New York law*, see id.* at 50–53, and that, in view of his "significant underlying psychiatric and substance abuse issues," his lengthy sentence ran afoul of New York sentencing caselaw and the Eighth Amendment's prohibition on cruel and unusual punishment, *id.* at 54–58.

*Fifth*, petitioner argued that he was denied the effective assistance of counsel because his lawyer apparently did not advise him "of his right to testify before the grand jury." *Id.* at 58. Petitioner contended that, had he been permitted to testify, the grand jury would not have returned a true bill, and that he thus would never have been convicted. *See ibid.*

The appellate division affirmed petitioner's conviction. *See People v. Smith*, 106 N.Y.S.3d 318 (App. Div. 2019). It first held that petitioner's argument that the trial court should have held a separate *Mapp* hearing was unpreserved for appellate review under Section 470.05 of New York's Criminal Procedure Law because the court "incorporated the *Mapp* hearing into the *Huntley* hearing without objection by the defendant," and that in any event the argument was without merit because "the defendant had the opportunity to call witnesses and cross-examine the People's witnesses about the physical evidence at issue." *Id.* at 319. And it held that petitioner's arguments about the admissibility of the sneakers were likewise unpreserved and without merit. *See ibid.*

The appellate division next rejected petitioner's sufficiency-of-the-evidence claims, finding that "the evidence was legally sufficient to establish the defendant's guilt of [both] attempted murder in the second degree . . . . [and] rape in the third degree." *Ibid.* It also found the sufficiency challenge with respect to the rape conviction unpreserved for appellate review. *Ibid.* And it further held that "the verdict of guilt as to each of the charges of which the defendant was convicted was not against the weight of the evidence." *Ibid.*

As for petitioner's argument that the court "deprived him of his right to present a defense by precluding the testimony of two witnesses regarding the state of [MC's] mental health 9 years before the incident and 10 years before her testimony," the appellate division once again held the claim unpreserved for appellate review and without merit, because it found "the proffered testimony . . . speculative and too remote in time to suggest that [MC] was not competent to testify at trial." *Id.* at 319–20.

Turning to petitioner's sentencing arguments, the appellate division concluded that petitioner's sentence was "not excessive" and that "consecutive sentences were appropriate" under

7

New York law because "the acts underlying the count of rape . . . were separate and distinct from those underlying the [remaining] charges." *Id.* at 320.

Finally, the appellate division concluded that it could not review petitioner's ineffective-assistance-of-counsel claim relating to the grand jury testimony because it could not "be resolved without reference to matter outside the record," meaning that "a CPL 440.10 proceeding is the appropriate forum for reviewing the claim in its entirety." *Ibid.*

The New York Court of Appeals denied petitioner leave to appeal. *See People v. Smith*, 137 N.E.3d 9 (N.Y. 2019).

## IV.    Petitioner's Section 2254 Application

Petitioner then sought a writ of habeas corpus in federal court under 28 U.S.C. § 2254. Petitioner submitted six substantive filings in support of his application before the government's response. Given petitioner's *pro se* status, the Court will consider each of those filings as part of the petition.

In the first of these submissions, petitioner renewed his argument that he received ineffective assistance of counsel as a result of the grand jury proceedings. *See* Pet'r's Filing mailed 4/14/2020 ("Pet. A") 1 (Dkt. #1).  The filing also asserted in passing that the trial judge was "prejudice[d]," and referenced the "Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments." *Ibid.*

Petitioner's next filing, mailed on June 3, 2020, raised several additional claims.  First, petitioner asserted that there was "legally insufficient evidence to support [his] conviction." Pet'r's Filing mailed 6/3/2020 ("Pet. B") 1 (ECF pagination) (Dkt. #6).  Petitioner next stated that the prosecutor "kept telling [the] all white jury they promise to convict [petitioner]," and that at some point the trial judge had "follow[ed the] jury out of [the] court room for deliberation." *Ibid.* (capitalization altered).  And he asserted that "the jury was selected in a racially discriminatory

8

manner," and that his lawyer "did not . . . object" to this alleged *Batson* violation. *Id.* at 1–3. Additionally, petitioner argued that evidence that was the product of an unlawful search and seizure—presumably, the sneakers seized at the time of petitioner's arrest—was admitted at trial, and that this Fourth Amendment violation was "not b[r]ough[t] up during trial." *Id.* at 3. And he asserted that some witnesses told "lies under oat[h]." *Ibid.*

Another letter mailed two days later referenced several of the same claims mentioned in the first two filings—the Fourth Amendment claim relating to petitioner's sneakers, the *Batson* claim, the assertion that a witness lied on the stand, and the ineffective assistance claim relating to the grand jury proceedings. *See* Pet'r's Filing mailed 6/5/2020 ("Pet. C") 1–3 (Dkt. #5). But it also raised several new constitutional claims: that "the prosecution admitted hearsay and out of court statements against [him] in violation of the Confrontation Clause of the Sixth Amendment"; that a witness testified about "another incident that . . . had nothing to do with trial" in violation of petitioner's Fifth Amendment due process rights; and that petitioner's sentence was "illegal" and amounted to "cruel and unusual punishment" under the Eighth Amendment. *Ibid.* (capitalization altered). Additionally, the filing contained a passing citation to *United States v. Bagley*, 473 U.S. 667, 682 (1985), a case in the *Brady* line holding that undisclosed evidence is "material" for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See* Pet. C 1. But the filing did not identify what material evidence, if any, was alleged to have been withheld.

Several months later, in September 2020, petitioner submitted a form Section 2254 petition. In addition to referencing several of the arguments already discussed, petitioner raised a handful of new contentions. He first expanded on the alleged improprieties in the trial judge's conduct during jury deliberations, asserting (without citing to any portion of the record) that "[t]he judge follow[ed] the jury out for their deliberation, and upon returning himself, stated that [the]

9

jury had asked him for more papers to help them on their decision . . . because they the jury could not reach [a] decision with what was heard." Pet'r's Filing mailed 9/3/2020 ("Pet. D") 5 (ECF pagination) (Dkt. #10). Petitioner next expanded on his Fourth Amendment claim, contending that "[t]he hearing court erred in rendering a *Mapp* decision on the basis of testimony derived from a *Huntley* hearing" and that "[t]he people did not establish probable cause for seizure of [the] sneakers" due to the lack of a "*Mapp* hearing*." Id*. at 2. Petitioner also reraised his earlier contention, *see* Pet. B 1, that the prosecutor "told [the] jury [that] they had promise[d] . . . to find [petitioner] guilty" and argued that his trial counsel should have objected to this statement. Pet. D 5. Additionally, petitioner added more context to his claim that a witness testified about "another incident," Pet. C 2, explaining that "Al Sharpen who is a retired correctional officer got on [the] witness stand and told of an []argument he witness[ed] in July of 2015." Pet. D 6. Petitioner was presumably referring to Alvin Horne, who testified that he was a retired correctional officer and that he witnessed petitioner attack MC in June 2015. *See* 10/25 Tr. 168:11–12, 171:10–173:8. Finally, petitioner's filing mentioned that he had originally been offered an eight-year sentence as part of a plea agreement, suggesting that the sentence he received was retaliation for petitioner's exercising his right to proceed to trial. *See* Pet. D. 3.

Later that month, petitioner filed another letter, asserting that his trial counsel had rendered ineffective assistance when he failed to object to statements the trial judge and the prosecutor made to the jury. *See* Pet'r's Filing mailed 9/24/2020 ("Pet. E") 1 (ECF pagination) (Dkt. #11).

On the same day, petitioner filed a second form Section 2254 petition. For the first time, petitioner fleshed out the alleged *Brady* violation suggested in his prior filing, *see* Pet. C. 1, arguing that the "prosecutor commit[ted] a Brady violation concerning blood-testing evidence," *see* Pet'r's Filing mailed 9/24/2020 ("Pet. F") 5 (ECF pagination) (Dkt. #13). But once again petitioner did not identify what particular evidence the state failed to turn over. Petitioner also fleshed out his

10

claim regarding the sufficiency of the evidence against him, *see* Pet. B 1, arguing that the jury was "not justified in relying on" MC's "inconsisten[t]" testimony, Pet. F 2, and that no knife "was found at the crime scene," *id.* at 5. Petitioner further argued that his trial counsel rendered ineffective assistance by "fail[ing] to conduct any pretrial discovery and fail[ing] to file [a] timely motion to suppress illegally seized evidence." *Id.* at 13.Synthesizing the contentions raised across the six substantive filings, petitioner's Section 2254 application, liberally construed, presents the following claims for relief, which I divide into two groups based upon whether the claim was presented to and ruled on by the state court on petitioner's direct appeal. The following claims *were* presented to and ruled on by the appellate division:

- **Sentencing claims.** Petitioner raises two arguments respecting his state-court sentence.

    o First, petitioner argues that the state court unlawfully imposed consecutive sentences, invoking the Eighth Amendment's protection against cruel and unusual punishment. *See* Pet. C 3; Pet. A 1.

    o Next, petitioner contends that the sentencing judge impermissibly penalized him for declining the plea offer and proceeding to trial. *See* Pet. D 3.

- **Sufficiency of the evidence.** Petitioner argues that the evidence was "legally insufficient" to support his convictions. *See* Pet. B 1.

- **Fourth Amendment violation.** Petitioner argues that the trial court should have held a separate suppression hearing regarding the admissibility of the bloodstained sneakers and that the trial court erred in admitting the sneakers into evidence. *See id.* at 3; Pet. C 2; Pet. D 2.

Petitioner also raises several claims that were *not* presented to and ruled on by the state courts, specifically:

- ***Batson* violation.** Petitioner contends that the jury selection process was tainted by race discrimination in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). *See* Pet. B 1–3; Pet. C 1.

- **Confrontation Clause violation.** Petitioner argues that the prosecution relied on hearsay evidence that denied him his Sixth Amendment right to confront the witnesses against him. *See* Pet. C 1; Pet. D 6.

- **Due process violations.** Petitioner argues that he was denied a fair trial in several ways:

11

- First, petitioner argues that the prosecutor improperly told the jury that they had promised to convict petitioner. *See* Pet. B 1; Pet. D 5.

- Next, petitioner argues that the trial judge was prejudiced against him and improperly followed the jury out of the courtroom during their deliberations. *See* Pet. A 1; Pet. B 1; Pet. D 5.

- Additionally, petitioner argued that the trial court improperly permitted Alvin Horne to testify regarding the June 2015 incident between petitioner and MC. *See* Pet. C 2; Pet. D 6.

- Lastly, petitioner asserted that some unnamed witnesses lied on the stand. *See* Pet. B 3; Pet. C 1.

- ***Brady* violation.** Petitioner argues that the prosecution ran afoul of its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose material exculpatory evidence by failing to turn over unspecified "blood-testing evidence," Pet. F 5; *see* Pet. C 1.

- **Ineffective-assistance-of-counsel claim.** Finally, petitioner asserts that he was denied effective assistance of counsel based upon (1) pretrial counsel's failure to advise him of his right to testify in front of the grand jury (the ineffective-assistance claim that the state appellate court ruled should be presented in a CPL 440.10 proceeding), *see* Pet. C 3; (2) trial counsel's alleged failure to conduct pretrial discovery, *see* Pet. F 13; (3) trial counsel's failure to move to suppress petitioner's sneakers, *see ibid.*; (4) trial counsel's failure to raise a *Batson* challenge during jury selection, *see* Pet. B 1–3; and (5) trial counsel's failure to object to the prosecutor's statements to the jury and the judge's actions regarding the jury, *see* Pet. E 1.

The warden filed a response to the petition on January 22, 2021. Warden's Opp'n (Dkt. #22-1). Petitioner has since filed additional letters in reply to the warden's response. *See generally* Letters (Dkts. #25, 26, 27, 29, 31, 32, 33, 34, 35, 36, 45, 46).

On July 1, 2025, the Court found that petitioner appeared not to have exhausted his ineffective-assistance and *Brady* claims, and directed petitioner to advise the Court by September 1, 2025, whether he would prefer the Court dismiss the entire petition without prejudice or adjudicate only the exhausted claims. Mem. & Order 1, 10 (Dkt. #54). Petitioner has not responded to the Court's order. The Court therefore assumes, as it informed petitioner it would in the July order, that he "would like the Court to adjudicate only the exhausted claims," *id.* at 1, and deems the ineffective-assistance and *Brady* claims withdrawn.

## STANDARD OF REVIEW

A person in custody pursuant to a state-court judgment may seek a writ of habeas corpus on the ground that he is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under Section 2254, subject to exceptions not applicable here, a federal court may review a petitioner's claims only if the applicant has exhausted the remedies available to him in the courts of his state. 28 U.S.C. § 2254(b)(1)(A). "State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court . . . and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276–77 (1971)).

Section 2254 imposes a requirement of "total exhaustion," under which federal courts generally "may not adjudicate mixed petitions for habeas corpus, that is, petitions containing both exhausted and unexhausted claims." *Rhines v. Weber*, 544 U.S. 269, 273 (2005). A federal court faced with such a petition must typically either stay or dismiss the federal petition without prejudice to refiling upon exhaustion, unless the petitioner agrees to abandon his unexhausted claims and go forward only with his properly exhausted claims. *See Murphy v. Warden of Attica Corr. Facility*, No. 20-CV-3076 (LLS), 2020 WL 2521461, at *2 (S.D.N.Y. May 15, 2020) (citing *Rhines*, 544 U.S. at 277–78, and *Zarvela v. Artuz*, 254 F. 3d 374, 380–82 (2d Cir. 2001)).

Federal review of state convictions is further circumscribed by the related doctrine of procedural default. "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)) (emphasis omitted). "Out of respect for finality, comity,

13

and the orderly administration of justice," federal courts generally may not entertain such defaulted claims through habeas unless the petitioner shows "cause and prejudice to excuse the default." *Dretke v. Haley*, 541 U.S. 386, 388 (2004). A state prisoner who fails to make those showings can only receive habeas review if he "advance[s] . . . a credible and compelling claim of actual innocence," *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012)), such that "failure to consider the claim[] will result in a fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750.

Section 2254 also constrains federal review of even those claims that have been properly preserved. So long as a state court adjudicated a litigant's claim on the merits, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"[C]learly established Federal law" refers to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)) (internal alterations omitted). A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if the state court decides a case differently from how the Supreme Court decided a case "on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 406. A decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," *id.* at 407, meaning there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with

14

[Supreme Court] precedents," *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Finally, a determination that a state-court decision was "based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), requires more than that a federal court conducting habeas review "would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted). "If the state record is 'ambiguous' such that two different views of the facts find fair support in the record," Section 2254 "mandates deference to the state court's fact-finding." *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (citation omitted).

These standards are "intentionally difficult to meet," *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citing *White v. Woodall*, 572 U.S. 415, 418 (2014)), because federal habeas review is "a 'guard against extreme malfunctions in the state criminal justice systems,'" not "a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Richter*, 562 U.S. at 102–03).

## DISCUSSION

For the reasons set forth below, the habeas petition is denied.

### I.   Claims Presented to the State Court

Of petitioner's arguments that were presented to the state court on direct appeal and ruled on by that court—claims regarding the propriety of his sentence, the sufficiency of the evidence, and the admission of the sneakers—none supplies a basis for federal habeas relief.

#### A.   Sentencing Claims

Petitioner raises two arguments regarding the sentence imposed by the state court. Neither claim entitles petitioner to relief under Section 2254.

### 1.    Claims Regarding Consecutive Sentences

Petitioner first argues that the state court's imposition of consecutive sentences for his rape and attempted murder convictions was improper. Whether construed as arising under state law or under the Eighth Amendment, this claim does not supply a basis for habeas relief.

*State Law Claim*—Insofar as petitioner renews his contention that the trial court ran afoul of New York penal law when it imposed consecutive sentences for rape and attempted murder, *see* Pet'r's App. Br. 44–50 (citing N.Y. Penal Law § 70.25(2)), the claim is denied because it does not provide a basis for federal habeas relief. "[I]t is well established that '[w]hether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review.'" *Parker v. Graham*, 517 F. Supp. 3d 138, 156 (W.D.N.Y. 2021) (quoting *Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012)); *see Charles v. Fischer*, 516 F. Supp. 2d 210, 224 (E.D.N.Y. 2007) ("[F]ederal habeas courts have squarely held that claims regarding the imposition of consecutive sentences are purely a matter of state law and are not cognizable on habeas review.") (quoting *Figueroa v. Grenier*, No. 02-CV-5444 (DAB) (GWG), 2005 WL 249001, at *15 (S.D.N.Y. Feb. 3, 2005)); *Jackson v. Ercole*, No. 07-CV-0457 (KMK) (PED), 2010 WL 8357326, at *10 (S.D.N.Y. Dec. 23, 2010) (same), *report and recommendation adopted*, 2012 WL 292324 (S.D.N.Y. Jan. 30, 2012); *Davis v. Herbert*, No. 02-CV-4908 (JBW), 2003 WL 23185747, at *15 (E.D.N.Y. Oct. 24, 2003) (same); *Heath v. Hoke,* No. 88-CV-770 (JTE), 1989 WL 153759, at *3 (W.D.N.Y. Dec. 7, 1989) (same); *cf. United States v. McLean*, 287 F.3d 127, 136 (2d Cir. 2002) ("[T]here is no constitutionally cognizable right to concurrent, rather than consecutive, sentences.") (quotation marks and citation omitted). Accordingly, petitioner's claim regarding the propriety of his consecutive sentences under state law does not assert a "violation of

16

the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The claim is therefore dismissed.[1]

*Eighth Amendment Claim*—To the extent that petitioner argues that his sentence of imprisonment violates the Eighth Amendment's prohibition on cruel and unusual punishment, *see* Pet. A 1 (citing the Eighth Amendment), that claim is also denied. Petitioner does not contend that any of the offense-specific sentences imposed by the state court were unauthorized under state law. *See* Pet'r's App. Br. 44–58. And the Second Circuit has made clear that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam). In any event, "there is no Supreme Court case that has ever found a sentence to be in violation of the Eighth Amendment merely because of its length." *Bridges v. Lee*, No. 15-CV-4669 (MKB) (CLP), 2019 WL 11816536, at *12 (E.D.N.Y. Aug. 26, 2019) (citing *Carmona v. Ward*, 576 F.2d 405, 408 (2d Cir. 1978)), *report and recommendation adopted*, No. 15-CV-4669 (BMC), 2021 WL 688292 (E.D.N.Y. Feb. 23, 2021), so petitioner cannot succeed in showing that, in upholding his sentence, the Appellate Division rendered a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d).

### 2. Claims Regarding a Trial Penalty

Petitioner next argues that, by imposing the statutory maximum sentences and running them consecutively to one another, the state trial court punished petitioner for rejecting a plea deal

---

[1] The warden defends the state court's imposition of consecutive sentences but concedes that the trial court erred by imposing a 25-year term of post-release supervision for petitioner's attempted murder convictions when state law caps the term at five years. *See* Warden's Opp'n 19. The warden thus states that petitioner's "period of post-release supervision should be modified to reflect the statutory period required by [New York law]." *Ibid.* The parties should present that issue to a state court, because this Court is not the appropriate venue to make this state-law-based modification. First, petitioner himself never made this argument, either to this Court or on his direct appeal of his conviction, so the Court does not consider it part of his habeas petition. And in any event, that error is one only of state law, so this Court lacks jurisdiction to modify petitioner's sentence in this way. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("Federal habeas corpus relief does not lie for errors of state law.").

and proceeding to trial in violation of *United States v. Jackson*, 390 U.S. 570 (1968). *See* Pet. D 3; Pet'r's App. Br. 50–53. The Appellate Division rejected the claim as meritless. *See Smith*, 106 N.Y.S.3d at 320. Because petitioner's vindictive sentence argument is entirely conclusory, the Appellate Division's decision rejecting it was not objectively unreasonable.

"[W]hile an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). In *North Carolina v. Pearce*, 395 U.S. 711 (1969), the Supreme Court first addressed claims of unconstitutional vindictiveness in sentencing, holding that due process "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *Id.* at 725. *Pearce* held that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for him doing so must affirmatively appear." *Id.* at 726. "Otherwise, a presumption arises that a greater sentence has been imposed for a vindictive purpose—a presumption that must be rebutted by objective information justifying the increased sentence." *Alabama v. Smith*, 490 U.S. 794, 798–99 (1989) (quotation marks, ellipsis, and citation omitted). The *Pearce* presumption is reserved for circumstances "in which there is a reasonable likelihood that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Id.* at 799 (quotation marks and citation omitted). Otherwise, "the burden remains upon the defendant to prove actual vindictiveness." *Ibid.*

The Supreme Court has applied the *Pearce* framework to decisions by prosecutors in pretrial settings related to a defendant's invocation of his trial rights. In *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), the Supreme Court found no due process violation under *Pearce* where the prosecutor carried out a promise made during plea negotiations to bring additional charges, justified by the evidence, against a defendant who refused to plead guilty to the original offense

18

with which he was charged.  The Court reasoned that the *Pearce* presumption of vindictiveness should not apply.  While *Pearce* guards against the risk that "the State might be retaliating against the accused" for exercising his constitutional rights, under the "'give-and-take' of plea bargaining, there is no . . . element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Id.* at 363.  Similarly, in *United States v. Goodwin*, 457 U.S. 368 (1982), the Court declined to apply the *Pearce* presumption where the prosecutor brought additional charges against a defendant who demanded a trial by jury, as opposed to a bench trial.  "The possibility that a prosecutor would respond to a defendant's pretrial demand for a jury trial by bringing charges not in the public interest that could be explained only as a penalty imposed on the defendant is so *unlikely* that a presumption of vindictiveness certainly is not warranted." *Id.* at 384.

The mere fact that a sentencing court, following the defendant's conviction after trial, has imposed a higher sentence than a prosecutor's pretrial plea offer does not present a reasonable likelihood of actual vindictiveness such that the *Pearce* presumption is warranted.  *See Correia v. Hall*, 364 F.3d 385, 388–89 (1st Cir. 2004).  This conclusion necessarily flows from the Supreme Court's recognition "that a State may encourage a guilty plea by offering substantial benefits in return for the plea," including by offering the defendant "a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty." *Corbitt v. New Jersey*, 439 U.S. 212, 219–20 (1978) (citation omitted).  "While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices is an inevitable—and permissible—attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Bordenkircher*, 434 U.S. at 364 (brackets, quotation marks, and citation omitted).  Accordingly, a petitioner can succeed on a claim of vindictiveness based on a disparity between a rejected plea and the sentence

19

following trial only by showing "actual vindictiveness on the part of the sentencing authority." *Smith*, 490 U.S. at 799; *see Edwards v. Artus*, No. 06-CV-5995, 2009 WL 742735, at *6 (E.D.N.Y. Mar. 20, 2009) ("[I]n the absence of proof of actual vindictiveness, the Supreme Court has upheld as perfectly constitutional the disparity between a sentence negotiated as part of a plea and one imposed after trial.").

Petitioner has not made the required showing of actual vindictiveness. Petitioner points to no evidence of retaliation on the sentencing judge's part: his argument is premised entirely on the (concededly large) disparity between the eight-year sentence petitioner rejected as part of a plea deal and the sentence ultimately imposed. *See* Pet'r's App. Br. 50–53. What is more, petitioner's trial counsel mentioned the rejected eight-year plea offer to the sentencing judge and asked that petitioner "not be penalized for going to trial." 12/22 Tr. 23:3–7. The judge responded that, because he "had no connection with this case prior to it coming here for trial" and thus "had no discussions as far as offers being made or anything of that sort," petitioner would "not . . . be penalized for going to trial," but rather "for doing acts he committed for which he was convicted." *Id.* at 23:8–24. On this record, without any evidence of "actual vindictiveness on the part of the sentencing authority," *Smith*, 490 U.S. at 799, it was not objectively unreasonable for the Appellate Division to reject petitioner's vindictive sentencing claim as meritless.

Petitioner is therefore not entitled to relief on his sentencing claims.

## B. Sufficiency-of-the-Evidence Claim

Next, petitioner argues that the evidence at trial was insufficient to support a conviction. Claims that the evidence was insufficient to support a conviction implicate the Fourteenth Amendment's Due Process Clause and are thus cognizable on federal habeas review. *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *McKinnon v. Superintendent*, 422 F. App'x 69, 75 (2d. Cir. 2011). Nonetheless, petitioner's sufficiency-of-the-evidence claim fails.

20

A petitioner bringing a sufficiency claim "bears a very heavy burden." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quotation marks and citation omitted). A sufficiency claim can succeed only when, upon "review[ing] the evidence in the light most favorable to the State," it is clear that "no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." *Ibid.* (citing *Jackson*, 443 U.S. at 319). Under that standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel*, 558 U.S. at 133 (quoting *Jackson*, 443 U.S. at 326). Likewise, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). This "limited review" ensures that courts "do[] not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson*, 443 U.S. at 319).

A "twice-deferential standard" of review applies to sufficiency-of-the-evidence challenges on federal habeas review, *Parker v. Matthews*, 567 U.S. 37, 43 (2012), because "the deference to state court decisions required by [28 U.S.C.] § 2254(d) is applied to the state court's already deferential review," *Cavazos*, 565 U.S. at 7. Accordingly, "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Matthews*, 567 U.S. at 43 (citation and quotation marks omitted).

"When considering the sufficiency of the evidence of a state conviction, a federal court must look to state law to determine the elements of the crime." *Ponnapula*, 297 F.3d at 179 (citation, quotation marks, and alterations omitted). Petitioner was convicted of second-degree attempted murder, first- and second-degree assault, third-degree rape, second-degree menacing,

third-degree assault, and criminal obstruction of breathing or blood circulation.  The elements of

those crimes under New York law are as follows:

- **Second-degree attempted murder.**  A person commits second-degree attempted murder "when, with the intent to cause the death of another person, [he] engages in conduct which tends to effect the commission of that crime." *People v. Fernandez*, 673 N.E.2d 910, 914 (N.Y. 1996) (citing N.Y. Penal Law §§ 110.00; 125.25).

- **First-degree assault.**  A person commits first-degree assault when, "[w]ith intent to cause serious physical injury to another person, he causes such injury . . . by means of a deadly weapon or dangerous instrument."  N.Y. Penal Law § 120.10(1).

- **Second-degree assault.**  A person commits second-degree assault when, "[w]ith intent to cause physical injury to another person, he causes such injury . . . by means of a deadly weapon or a dangerous instrument."  N.Y. Penal Law § 120.05(2).

- **Third-degree assault.**  A person commits third-degree assault when, "[w]ith intent to cause physical injury to another person, he causes such injury to such person."  N.Y. Penal Law § 120.00(1).

- **Third-degree rape.**  A person commits third-degree rape when he "engages in sexual intercourse with another person who is incapable of consent by reason of some factor other than being less than seventeen years old."  N.Y. Penal Law § 130.25(1).

- **Second-degree menacing.**  A person commits second-degree menacing when he "intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon [or] dangerous instrument."  N.Y. Penal Law § 120.14(1).

- **Criminal obstruction of breathing or blood circulation.**  A person commits criminal obstruction of breathing or blood circulation "when, with intent to impede the normal breathing or circulation of the blood of another person, he . . . applies pressure on the throat or neck of such person."  N.Y. Penal Law § 121.11.

Here, the appellate division determined that the evidence was sufficient to establish

petitioner's guilt beyond a reasonable doubt on all charges.[2]   That determination was not

---

[2] The appellate division concluded that the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt on the charge of second-degree attempted murder and third-degree rape.  *See Smith*, 106 N.Y.S.3d at 319.  It also concluded that the verdict of guilt as to each of the charges of which defendant was convicted was "not against the weight of the evidence."  *Ibid.*  Because "a weight-of-the-evidence claim requires more exacting review than an insufficiency claim," the appellate division's decision "that [petitioner's] conviction was not against the weight of the evidence . . . necessarily decided that there was sufficient evidence to support the verdict."  *Parker v. Ercole*, 666 F.3d 830, 833 (2d. Cir. 2012) (per curiam).

"objectively unreasonable." *Matthews*, 567 U.S. at 43 (citation omitted). MC testified, for instance, that petitioner stabbed her with a knife near her lungs, heart, and organs. 10/25 Tr. 68:08–11. She also testified that, at the hospital, she was treated for a collapsed lung, a broken shoulder, and stab wounds. *Id.* at 82:01–19, 84:25–85:04, 85:17–89:06. Moreover, other evidence corroborated MC's testimony regarding the stabbing. The prosecution admitted into evidence several photographs of MC's stab wounds. *Id.* at 78:16–81:06, 82:20–84:14. The resident of a home nearby the scene of the stabbing testified that MC appeared bleeding at his doorstep and stated that petitioner had tried to kill her. 10/24 Tr. 39:01–11. And a nurse and doctor testified to treating MC's injuries at the hospital. 10/26 Tr. 9:25–12:05, 143:03–22. Finally, a bloodstain on the sneakers that police officers recovered from petitioner's residence matched MC's DNA profile. *Id.* at 43:12–15. In challenging the sufficiency of this evidence, petitioner emphasizes that a knife was never recovered. *See* Pet. F 5. Assuming *arguendo* that petitioner exhausted that argument on appeal, it is unavailing. The testimony describing MC's injuries, the photographs depicting her wounds, and the DNA evidence all support the inference that petitioner stabbed MC intending to cause her death and serious physical injury and that he used a knife—that is, a deadly weapon or dangerous instrument—to do so. *See Fernandez*, 673 N.E.2d at 914 (listing the elements of second-degree attempted murder); N.Y. Penal Law § 120.10 (listing the elements of first-degree assault); *id.* § 120.05(2) (listing the elements of second-degree assault). The appellate division therefore reasonably concluded that the record supported petitioner's convictions for second-degree attempted murder, first-degree assault, and second-degree assault.

The record also contained ample evidence supporting the third-degree rape and second-degree menacing convictions. Specifically, MC testified that petitioner brandished a knife and told MC that he wanted to have sex with her. 10/25 Tr. 63:12–64:18. She further testified that she complied with petitioner's request because she was afraid he would stab her if she did not. *Id.*

23

at 64:20–25.  MC also explained that she did not want to have sex with petitioner and that she "didn't really consent" but that she "was in shock" after petitioner "took out the knife" and threatened to kill her.  *Id.* at 65:10–13.  Though MC also testified that she refused a sexual-assault exam at the hospital, she explained that, at the time, she "thought rape was when . . . somebody puts a knife to your throat."  *Id.* at 90:23–24.  And though, at one point in her testimony, MC denied that petitioner "display[ed] the knife . . . prior to engaging in sexual intercourse," *id.* at 91:06–08, she later testified that she saw the knife before petitioner indicated that he wanted to have sex with her, *id.* at 92:02–03.  Petitioner alleges that the jury should not have credited MC's "inconsisten[t]" testimony, *see* Pet. F 2, but any inconsistencies go to MC's credibility, which "is generally beyond the scope of review" for sufficiency-of-evidence claims, *Schlup*, 513 U.S. at 330.  A rational jury relying on MC's testimony could therefore conclude that petitioner engaged in sexual intercourse with MC while she was incapable of consenting due to the knife and petitioner's threat to kill her.  *See* N.Y. Penal Law § 130.25 (listing the elements of third-degree rape).  And, relying on the same testimony, a rational jury could conclude that petitioner intentionally placed MC in reasonable fear of physical injury by displaying the knife.  *See id.* § 120.14 (listing the elements of second-degree menacing).

Finally, the record contained ample evidence supporting the convictions for third-degree assault and criminal obstruction of breathing or blood circulation.  Both MC and Alvin Horne testified that petitioner pulled MC into the backseat of a truck, choked her, pulled her into the street, and stomped on and hit her.  10/25 Tr. 50:17–55:07, 171:10–172:18.  That testimony supports the inference that petitioner intended to and did in fact cause MC physical injury.  *See* N.Y. Penal Law § 120.00 (listing the elements for third-degree assault).  And it likewise supports the inference that petitioner applied pressure on MC's neck or throat with the intent to impede her

normal breathing or circulation of blood. *See id.* § 121.11 (listing the elements for criminal obstruction of breathing or blood circulation).

Petitioner is therefore not entitled to relief on his sufficiency-of-the-evidence claim.

### C.        Fourth Amendment Claim

To the extent petitioner's application is read to renew his argument that the state trial court erred by declining to suppress the sneakers seized at the time of his arrest, *see* Pet. B 3; Pet. C 2, that argument also fails.

The Supreme Court has held that "a petitioner may not obtain habeas relief under the Fourth Amendment on the ground that the state court declined to suppress evidence obtained in an unlawful search if he had a full and fair opportunity to litigate the claim in state court." *Ethridge v. Bell*, 49 F.4th 674, 681 (2d Cir. 2022) (citing *Stone v. Powell*, 428 U.S. 465, 494 (1976)); *see Brown v. Davenport*, 596 U.S. 118, 133 (2022) (citing *Stone* for the proposition that "some claims are not cognizable in federal habeas if state courts provide a mechanism for review"). Under that logic, habeas relief based upon an asserted Fourth Amendment violation is available only if the petitioner "shows that the state denied him an opportunity for full and fair litigation of [that] claim," meaning "either that 'the state has provided no corrective procedures at all to redress the alleged fourth amendment violations,' or, 'if the state has provided a corrective mechanism,' that the petitioner 'was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.'" *Ethridge*, 49 F.4th at 684 (quoting *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992)).

Petitioner cannot make the required showing because he was given a full and fair opportunity to litigate his Fourth Amendment claim in state court. Consistent with New York's procedure for Fourth Amendment claims, the trial court held a suppression hearing before trial. *See* N.Y. Crim. Proc. Law § 710.60. And "federal courts have approved New York's procedure"

as "facially adequate" for providing a full and fair opportunity to litigate Fourth Amendment claims. *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)).

Nor has petitioner established that he was "precluded from using that mechanism because of an unconscionable breakdown." *Ethridge*, 49 F.4th at 684 (quoting *Capellan*, 975 F.2d at 70). Petitioner argues that "[t]he hearing court erred in rendering a *Mapp* decision on the basis of testimony derived from a *Huntley* hearing." Pet. D 2. In other words, petitioner takes issue with the fact that the trial court ruled on the admissibility of both petitioner's statement regarding his sneakers as well as the sneakers themselves at the same hearing. But the trial court's decision to "morph" the *Huntley* hearing into a *Mapp* hearing, 1/22 Tr. 29:13, does not constitute the sort of unconscionable breakdown that warrants relief.

Indeed, the admissibility of both petitioner's statement and his sneakers turned on the same evidence. The trial court first determined that petitioner's statement asking officers to retrieve the sneakers from his bedroom was admissible because it "was not pursuant to any questioning by any of the police." *Id.* at 29:16–23; *see Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (explaining that "*Miranda* safeguards come into play" only when "a person in custody is subjected to either express questioning or its functional equivalent"). The trial court then determined that petitioner's sneakers were admissible because that same statement constituted consent to the seizure. 1/22 Tr. 29:16–20; *see Washington v. Chrisman*, 455 U.S. 1, 9–10 (1982) (explaining that a "seizure . . . pursuant to . . . valid consent d[oes] not violate the Fourth Amendment"). And the trial court made those determinations after petitioner called the officer who retrieved his sneakers as a witness and asked him questions related to petitioner's statement. 1/22 Tr. 17:01–19:20. Petitioner thus had a full and fair opportunity to present evidence relating to the admissibility of both the statement and the sneakers—regardless of whether the trial court initially suggested that

26

the hearing related only to the admissibility of petitioner's statement (and, of course, regardless of whether the trial court's ultimate decision on the Fourth Amendment question was correct).

Petitioner is therefore not entitled to relief on his Fourth Amendment claim.

## II.  Claims Not Presented to the State Court

Because petitioner's *Batson*, Confrontation Clause, and due process claims are procedurally barred under state law, those claims are dismissed as procedurally defaulted.  *See Reyes*, 118 F.3d at 140 (explaining that "a claim is procedurally defaulted" if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred" (citation, emphasis, and quotation marks omitted)).  As relevant here, Section 450.10 of New York's Criminal Procedure Law entitles a criminal defendant to one direct appeal.  *See* N.Y. Crim. Proc. Law § 450.10.  Criminal defendants may also seek postconviction relief under Section 440.10, but such relief is barred where "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted . . . adequate review of the ground or issue raised" on direct appeal and the defendant "unjustifiabl[y] fail[ed] to raise such ground or issue" in that appeal.  *Id.* § 440.10(2)(c).  This bar to postconviction relief does not apply to claims raising ineffective assistance of counsel.  *Ibid.*

Petitioner is procedurally barred from seeking relief under Section 450.10 because he already exhausted his one direct appeal and failed to raise his *Batson*, Confrontation Clause, or due process claims.  Petitioner therefore cannot seek relief on those claims under Section 450.10.

Petitioner is likewise barred from seeking relief under Section 440.10 because the trial record contains "sufficient facts" to permit "adequate review" of his claims.  *Id.* § 440.10(2)(c).  In support of his *Batson* claim, petitioner argues that "the jury was selected in a racially discriminatory manner."  Pet. B 1.  He also argues, in support of his Confrontation Clause claim, that "the prosecution admitted hearsay and out of court statements against [him]."  Pet. C 1.  And

27

he raises several arguments in support of his due process claims—specifically the trial judge was prejudiced against him, Pet. A 1, that the trial judge improperly followed the jury out of the courtroom, Pet. B 1; Pet. D 5, that Alvin Horne's testimony "had nothing to do with the trial," Pet. C 2; and that an unnamed witness lied on the stand, Pet. B 3; Pet. C 1.  The record here permits review of those claims.  It includes transcripts from jury selection, the pretrial suppression hearing, the trial, and the judge's instructions and comments to the jury.  An appellate court relying on that record would be able to adequately review petitioner's claims relating to jury selection, the evidence admitted against him, and the trial judge's and prosecutor's interactions with the jury.  Moreover, petitioner fails to give any justification for his failure to raise those claims on direct appeal, as required under Section 440.10.  *See* N.Y. Crim. Proc. Law § 440.10(2)(c).  The claims are therefore procedurally barred under New York law.

Finally, petitioner has neither shown "cause and prejudice to excuse the default," *Dretke*, 541 U.S. at 388,[3] nor "advance[d] . . . a credible and compelling claim of actual innocence," *Hyman*, 927 F.3d at 656 (quoting *Rivas*, 687 F.3d at 540).  Petitioner's *Batson*, Confrontation Clause, and due process claims are therefore dismissed as procedurally defaulted.

## CONCLUSION

For the foregoing reasons, the petition is denied.  And because petitioner has not shown "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further,'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)) (quotation marks omitted), a certificate of appealability under 28 U.S.C.

---

[3] Although petitioner makes several ineffective-assistance-of-counsel claims, *see* pages 12–13, *supra*, he never claims ineffectiveness in his appellate counsel that might serve as cause for excusing his failure to raise these defaulted claims on direct appeal.

§ 2253(c)(2) is also denied.  The Clerk of Court is directed to enter judgment and close the case.

The Clerk of Court is also respectfully directed to mail a copy of this order to plaintiff and file

proof of mailing on the docket.

       SO ORDERED.

                                        */s/ Rachel Kovner*
                                        RACHEL P. KOVNER
                                        United States District Judge

Dated: April 3, 2026
       Brooklyn, New York